IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **NATHANIEL DILL, Administrator of the Estate of DYMIR STANTON, deceased**<br><br>*Plaintiff*<br><br>v.<br><br>**80-LOWER; TACTICAL GEAR HEADS, LLC; CHAD MYERS; and JOHN DOE/ABC COMPANY**<br><br>*Defendants* | **CIVIL ACTION**<br><br>**NO: 25-cv-03397**<br><br>**JURY TRIAL DEMANDED** |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT CHAD MYERS' MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION**

Plaintiff, Nathaniel Dill, by and through his attorneys, Kline & Specter, P.C. hereby responds in opposition to the Motion of Defendant, Chad Myers, to Dismiss for a lack of personal jurisdiction and in support thereof incorporates the attached Memorandum of Law as if set forth at length herein.

**WHEREFORE**, Plaintiff respectfully requests this Honorable Court enter an Order in denying the Motion of Defendant, Chad Myers, to Dismiss for a lack of personal jurisdiction.

**KLINE & SPECTER. P.C.**

By: _____

JOHN P. O'NEILL, ESQUIRE
Attorney ID: 205677
1525 Locust Street
Philadelphia, PA 19102
215-772-1000

Date: <u>August 10, 2026</u>                    Attorney for Plaintiff

**IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **NATHANIEL DILL, Administrator of the Estate of DYMIR STANTON, deceased** | **CIVIL ACTION** |
| *Plaintiff* | |
| **v.** | **NO: 25-cv-03397** |
| **80-LOWER; TACTICAL GEAR HEADS, LLC; CHAD MYERS; and JOHN DOE/ABC COMPANY** | **JURY TRIAL DEMANDED** |
| *Defendants* | |

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT CHAD MYERS'
MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION**

**I.       MATTER BEFORE THE COURT**

This case arises from a horrific mass shooting and mass murder in Philadelphia,

Pennsylvania carried out using products sold by Moving Defendant, Chad Myers. Kimbrady

Carriker is a person who suffers from severe mental illness and who is not legally eligible to

purchase a firearm in the Commonwealth of Pennsylvania for several reasons including

Carriker's criminal conviction in Philadelphia for a Violation of the Uniform Firearms Act 18 §

6106. Prioritizing profit over human lives and the safety of the people of Philadelphia as well as

Federal, State, and City of Philadelphia Laws, Defendant, Chad Myers, sold components for an

AR-15 style assault weapon, including the key component, a receiver, to Carriker even though he

was prohibited from having a firearm. But for Chad Myers' actions, Carriker would not have

been able to acquire a firearm. As a direct result of Chad Myers' actions, however, Carriker

obtained the necessary components for an assault rifle and used it to shoot nine people,

murdering five of them, including Plaintiff's decedent, Dymir Stanton, a twenty-nine-year-old

young man with a six-year-old daughter. Pursuant to this honorable Court's Order on December 22, 2025, granting Plaintiff's request to conduct jurisdictional discovery concerning Defendant Chad Myers as well as this honorable Court's Order on June 10, 2026, compelling Defendant Chad Myers to submit to a deposition, Plaintiff has obtained enough evidence to support personal jurisdiction over Defendant, Chad Myers. *See* Exhibit "A"  and "B" Plaintiff therefore respectfully requests that this Honorable Court deny Defendant Chad Myers' Motion to Dismiss. In the alternative, because Defendant, Chad Myers, has been noncompliant with a substantial amount of Plaintiff's discovery requests, as outlined in Plaintiff's memorandum, Plaintiff requests that this honorable Court enter an Order compelling Defendant to respond to Plaintiff's outstanding discovery requests and allow Plaintiff to supplement Plaintiff's response once Defendant has done so.[1]

## II.    FACTUAL BACKGROUND

Plaintiff is the father of Dymir Stanton, who was a twenty-nine-year-old man and the father of a six-year-old daughter, N.S. On July 3, 2023, Kimbrady Carriker turned the Philadelphia Neighborhood of Kingsessing into a warzone, opening fire on the community near the 1600 Block of South 56th Street with an AR-15 style assault rifle, shooting nine people and killing five of them, including Dymir Stanton. For many reasons, Kimbrady Carriker Should never have been able to obtain the military style weapon that he used to achieve this atrocious act of mass violence and mass murder and he would not have been able to if not for the actions of Chad Myers.

---

[1] During his June 22, 2026, deposition, Mr. Myers committed to providing documentation related to eight different subjects relevant to the issue of Personal Jurisdiction by July 6, 2026. Despite a letter from Plaintiffs on July 20, 2026, reminding him of same, attached here as Exhibit "M", Defendant has still not produced any of the discovery that he committed to produce by July 6, 2026.

On December 8th, 2003, Carriker was arrested in Philadelphia, Pennsylvania while illegally possessing a firearm. *See* Exhibit "C" First Judicial District of Pennsylvania Court Summary Docket Number CP-51-CR-0302781-2004. On January 19th, 2005, Carriker was convicted of 18 Pa. C.S. § 6106. *Id*. From that date on, it was illegal to sell Carriker a firearm. *See e.g.* 18 U.S.C. § 922(g) Furthermore, if Carriker attempted to purchase any firearm in Pennsylvania, the prospective seller would have been legally required to utilize the Pennsylvania Instant Check System ("PICS") to ascertain whether or not Carriker had a criminal conviction that prohibited him from purchasing a firearm, and, upon doing so, would have discovered that he had such a conviction and would have been legally required to refuse the sale to him. *See e.g.* 18 Pa. C.S. § 6111.

Additionally, Pennsylvania law required that any sale of any firearm to Carriker be recorded and for the records of the sale to be communicated to the Pennsylvania State Police. Among other requirements of this recorded sale, any seller who sold Carriker any firearm was required to record and communicate to the Pennsylvania State Police the serial number of the firearm that was sold. *See e.g.* 18 Pa. C.S. § 6111 and 37 Pa. Code § 33.111(outlining the specific forms and information required to be recorded).

On December 16, 2019, Pennsylvania Attorney General Josh Shapiro issued detailed and thoroughly supported legal guidance that a ghost gun component receiver is a firearm within the context of the Pennsylvania Uniform Firearms Act. *See* Exhibit "D" (December 16, 2019, Legal Guidance of Attorney General Josh Shapiro).

Moreover, As of January 27, 2021, The Philadelphia City Code established, in relevant part, that "[n]o person shall sell or otherwise transfer a firearm finishing device or an unfinished

3

frame or receiver unless the transferor and transferee are both federal firearms licensees". *See* Attached as Exhibit "E" City of Philadelphia, PA Bill No. 200593 (2020).

Tragically for Dymir Staton and Defendants' other victims, Chad Myers chose to violate and/or evade all of these rules and regulations in order to put an assault rifle style firearm in the hands of people like Carriker who could not otherwise obtain them. Chad Myers did so with the knowledge that such people, who were seeking to obtain firearms without adhering to legally required background checks, serialization of the firearm, record keeping of the sale, and communication of the sale to the Pennsylvania State Police, wanted to do so to obtain the firearm for illegal purposes such as harming and killing people.

Outrageously, Chad Myers, even went so far as to employ messaging and marketing of these ghost gun components to the people of Pennsylvania, including Kimbrady Carriker, that directly communicated Chad Myers' intention to provide the products in secret and clandestine ways to evade Federal, State, and Local Laws and Regulations in order to provide these deadly weapons to people who were not authorized to acquire them and who were likely to use them to harm and kill people. *See* Exhibit "F", "G", and "H".

Despite the numerous prohibitions against providing firearms and ghost gun components to Kimbrady Carriker and the obvious dangers associated with doing so, Chad Myers sold a "Polymer 80 80% Lower Receiver and Jig Kit" for an AR-15 to Carriker, who used a Philadelphia, Pennsylvania billing address and a Pittsburgh, Pennsylvania shipping address, on August 30th, 2021, without doing anything to determine whether he had a criminal record that prohibited him from having a firearm, to serialize the ghost gun components, or to record the sale and communicate it to the Pennsylvania State Police. See Exhibit "I" (the record of sale). Tragically, but predictably, on July 3, 2023, Carriker used Moving Defendants' products to

4

brutally, wound, injure, and maim nine people, killing five of them and carrying out one of the largest mass shootings and mass murders in Philadelphia's history.

## III.   ARGUMENT

Under Federal Rule of Civil Procedure 4(k), a District Court typically exercises personal jurisdiction according to the law of the state where it sits. *See* Fed.R.Civ.P. 4(k)(1)(A). Because this case has been filed in the United States District Court for the Eastern District of Pennsylvania, the Pennsylvania long-arm statute should be applied. the Pennsylvania long-arm statute provides for jurisdiction "based on the most minimum contact with th[e] Commonwealth allowed under the Constitution of the United States." 42 Pa. Cons.Stat. Ann. § 5322(b); *see, Mellon Bank (East) PSFS, Nat'l Ass'n v. Farino,* 960 F.2d 1217, 1221 (3d Cir.1992).

Accordingly, in determining whether personal jurisdiction exists over Defendant Chad Myers, the proper question is whether, under the Due Process Clause, the defendant has "certain minimum contacts with ... [Pennsylvania] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *See* Int'l Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945); O'Connor v. Sandy Lane Hotel Co., 496 F.3d 312, 316–17 (3d Cir. 2007).

Through discovery, Plaintiff has obtained clear and convincing evidence that Chad Myers had total personal control over sales of ghost gun components into Pennsylvania. Furthermore, Plaintiff has also obtained conclusive evidence that, after pausing sales into Pennsylvania in response to Pennsylvania Attorney General Josh Shapiro's aforementioned legal guidance prohibiting such sales, Chad Myers personally restarted said sales into Pennsylvania, including his sale to Kimbrady Carriker that caused the mass shooting and mass murder that is the subject of this lawsuit.

Upon being sent a news story published by Fox 43 on December 16, 2019, that reported Attorney General Shapiro's position on ghost gun components, Chad Myers directed the following:

> I've read through the information Travis provided and our official stance is that we need to stop selling to PA. If the state views 80% lower receivers as a firearm, then they must be regulated as firearms are. This means that a background check would need to be completed prior to the sale of the "firearm". Additionally, we are not able to mail 80% receivers because they do not include a serial number. Over the past 2 years, PA sales have represented 3.95% of total sales.

See Exhibit "J".

Mr. Myers then went on to further direct "I will add the state restriction to the website today, Billy, please ensure the order bots are in fact working, and coordinate with Steve to contact customers with any pending orders." Id.

Despite his clear understanding of this prohibition, approximately a year later, Chad Myers made the decision that he would resume selling ghost gun components into Pennsylvania. In his deposition, Myers admitted that a reason that he made this decision was in order to make profits from sales in Pennsylvania that would otherwise not be made. See Exhibit "K" (Myers Deposition pg. 182 ln 4-23).

The record well establishes that Chad Myers had full authority and control over all decisions and actions of Tactical Gear Heads. For example, when discussing the structure of the company in 2021, when the ghost gun components were sold to Carriker, Mr. Myers gave the following responses to the below questions:

> Q.    Okay, so you owned 70 percent of the company and you were the manager, but you're saying the employees did not answer to you?
> A.    I'm saying there was different levels of hierarchy. Not everyone in the company reported directly to me.

Q.    Who was the top of the hierarchy?
A.    That was-
Q.    That was you, right?
A.    Correct.

See Exhibit "L" (Myers Deposition pg. 36 ln 3-13).

Furthermore, Mr. Myers admitted that he made the decision to start selling ghost gun products

back into Pennsylvania again after directing the stoppage in 2019.

Q.    …And then obviously at some point, and we'll figure out
when that was, **you** started to sell the products into
Pennsylvania again. How did **you** arrive at the decision to
do so?
A.    I believe it came from information provided by a journalist
in the space. I believe it was also largely or tied to
consultation from our attorney.

See Exhibit "N" (Myers Deposition pg. 173 ln. 21-pg. 174 ln. 5).[*emphasis added*]

Wellness Publishing v. Barefoot, 128 Fed.Appx. 266 (3d Cir.2005) provides useful

guidance to some of the fatal flaws in Mr. Myers' attempt to challenge personal jurisdiction in

this case. In that case the Third Circuit recognized that under the appropriate circumstances an

advertising campaign with national scope could provide the basis for specific jurisdiction over a

defendant in a particular state where advertisements were viewed. Id. In Barefoot, a group of

defendants produced infomercials for calcium supplements and related products that ran

nationally, including in New Jersey. Id. at 269. The defendants also processed telephone orders

for products promoted in the infomercials. Id. The District Court dismissed the Plaintiff's case

for lack of personal jurisdiction in New Jersey. Id. at 270. On appeal, however, the Third Circuit

reversed, holding that specific personal jurisdiction existed over the defendants that ran the

infomercials in New Jersey. Id. In doing so, it analogized the defendants' promotional activities

to the maintenance of a website. Id. (citing Toys "R" Us, Inc. v. Step Two, S.A., 318 F.3d 446,

452 (3d Cir. 2003)).

7

Under the Third Circuit's jurisdictional analysis of websites, if a defendant website operator intentionally targets the site to the forum state and/or knowingly conducts business with forum state residents via the site, then the "purposeful availment" required is satisfied. Toys "R" Us, 318 F.3d at 452. The Third Circuit applied this same jurisdictional analysis in Barefoot to hold that the defendants who ran the infomercials in New Jersey could be subject to personal jurisdiction in the state. 128 Fed.Appx. at 270.

Similarly, the Supreme Court has also held, under different circumstances, that defamatory statements distributed in the national media may support specific personal jurisdiction where those statements are relevant to a Plaintiff's claims. In Calder v. Jones, a Californian plaintiff sued a group of Floridian defendants for placing a defamatory article about her in a nationally circulated publication. 465 U.S. 783, 788-89, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984). The Plaintiff claimed that the defendants should be subject to jurisdiction in her home state of California. Id. The Supreme Court held that, because the defendant's intentional and allegedly illegal actions were expressly aimed at California and caused harm there, jurisdiction over the defendants was "proper in California based on the effects of their Florida conduct in California". Id. at 789, 104 S.Ct. 1482.

After stopping sales, advertising, and marketing in Pennsylvania as a result of the Attorney General's actions, Chad Myers, with complete control over Tactical Gear Heads, made the decision to begin selling, advertising, and marketing ghost gun components into Pennsylvania again in order to make profits from doing so. During his deposition, Mr. Myers made many statements that established that this decision, to restart selling into Pennsylvania, which included the sale to Carriker which resulted in the harm, in Pennsylvania, that is the subject of this lawsuit was entirely his.

Tactical Gear Heads did not have a board. See Exhibit "O" (Myers Deposition pg. 39 ln. 10-13). Chad Myers was the day-to-day manager of Tactical Gear Heads. Id. at Pg. 33 ln. 19-22, See Exhibit "EE". He had the power to hire and fire the employees. Id. at Pg. 35 ln. 20-23, See Exhibit "FF." Mr. Myers admitted that he had the "final say" as to whether ghost gun products were sold into Pennsylvania. Id. at Pg. 75 ln. 10-16, See Exhibit "GG". Mr. Meyers had all final say over all decisions made at Tactical Gear Heads and no one else had authority to "overrule a decision that [he] had delegated". Id. at Pg. 76 ln. 5-11, See Exhibit "HH". Mr. Myers had control over the Tactical Gear Heads bank account and the ability to withdraw money from it when he wanted to. Id. at Pg. 91 ln. 3-11, See Exhibit "II". Myers even confessed that "If I gave a[n] explicit directive, no one else had the authority to override that directive". Id. at Pg. 102 ln. 24-Pg. 103 ln. 1, See Exhibit "JJ".

With total control over sales of ghost gun products into Pennsylvania, and having restarted selling these products into the state in order to make profits, Chad Myers had substantial contacts with Pennsylvania, selling an alarmingly large number of them into Pennsylvania. In response to Plaintiff's first set of Interrogatories requesting that Defendant "Identify each category of unfinished or unserialized lower receivers sold in Pennsylvania and related documentation." Defendant answered that for the years 2021 through 2025 there were 49,089 orders into Pennsylvania with 2,770 of those going into Philadelphia. Of those almost 50,000 sales into Pennsylvania, 24,753 contained orders for the "P80-NKIT type product", the device used by Kimbrady Carriker in the mass shooting that is the subject of this litigation. See Exhibit "P" Defendant's Answers to Plaintiff's First Set of Interrogatories at pg. 3.

Not only did these substantial sales occur at the specific direction of Chad Myers, but he was regularly aware of their large numbers. In his deposition on June 22, 2026, Mr. Myers

admitted that he would review analytics on sales to customers which included the states the ghost gun components were being sold to. See Exhibit "Q" (Myers Deposition pg. 85 ln. 20 – pg. 88 ln. 17).

In Elbeco Inc. v. Estrella de Plato, Corp., 989 F. Supp. 669 (E.D. Pa. 1997), the Third Circuit asserted that "[i]n order to determine whether the corporate officer will be subject to personal jurisdiction, the following factors should be examined: the officer's role in the corporate structure, the quality of the officers contacts, and the extent and nature of the officer's participation in the alleged tortious act." Elbeco Inc., at 676 citing Maleski v. D.P. Realty Trust, 653 A.2d 54 (Pa.Cmwlth. 1994). Chad Myers' role in Tactical Gear Heads was as the person with total control and day-to-day management and the quality of his contacts included tens of thousands of ghost gun products being sold into Pennsylvania by him and at his direction.

Chad Myers created Tactical Gear Heads. See Exhibit "R" (Myers Deposition pg. 25 ln. 1-7). When the subject ghost gun product was sold to Kimbrady Carriker, Tactical Gear Heads did not have any independent physical or brick-and-mortar location, instead, Chad Myers ran it out of his house selling and marketing these products using his website and other online platforms. See Exhibit "S" (Myers Deposition pg. 39 ln. 14 –15 and pg. 23 ln. 11-13). With complete control over all aspects of Tactical Gear Heads, all marketing and advertising were done by Mr. Myers, at his direction, or with his approval.

Mr. Myers describes himself as having "20 plus years of experience in internet marketing" and having specialties in "marketing strategy, internet marketing, online retail, web design, and search engine optimization". See Exhibit "T" (Myers Linkin page) and also Exhibit "U" (Myers Deposition pg. 63 ln. 24 – pg. 64 ln. 10). Myers even went on a podcast called eCommerce Fuel on August 16th 2019, to brag about how effective he is at online marketing of

"controversial products". See Exhibit "V" (Transcript of Myers interview on eCommerce Fuel Podcast August 16, 2019). During the interview, while discussing marketing and selling "controversial products" such as ghost gun components, Chad Myers stated "Many of the mainstream channels just flat out don't want anything to do with you whether it be Google AdWords or Facebook, website click ads, PLA's, Shopping Ads, none of those are permittable for our type of subject matter. So it really forces us to be very good at the acquisition channels that we can utilize. Id. When asked at his deposition to explain the meaning of this statement, Myers essentially conflated himself and Tactical Gear Heads as though both were the same entity.

> Q.   And what would those channels be?
> A.   Primarily, search engine optimization and email marketing.
> Q.   Okay. Which are your specialties right?
> A.   Those are the specialties of Tactical Gear Heads as an entity, yes.
> Q.   And also specialties you list on your LinkedIn page, correct?
> A.   If that's what the LinkedIn post said, yeah.
> Q.   You don't disagree with your own LinkedIn post do you?
> A.   Nope. I do not.

See Exhibit "W" (Myers Deposition Transcript pg. 81 ln. 4-pg. 82 ln. 9)

It is easy to understand why Mr. Myers views himself and Tactical Gear Heads as being one-in-the same as they function as the same entity, both entirely controlled by Chad Myers and both, according to Chad Myers, specializing in the same types of online marketing of "controversial products" like ghost gun components.

This online marketing by Mr. Myers intentionally communicated to customers and potential customers in Pennsylvania that the products on offer would get ghost gun components to customers in ways that circumvented laws and regulations. *See* Exhibit "F", "G", and "H". Mr.

Myers further admitted in his deposition that he specifically chose to sell these products to meet this demand.

> Q. You chose not to have serial numbers on these products. Why did you make that choice?
> A. Because there is a certain interest in these types of products.
> Q. From who?
> A. A wide variety of customers who would like to construct their own firearm.
> Q. Without a serial number?
> A. Yes.

See Exhibit "X" (Myers Deposition Transcript pg. 104 ln. 6-15).

Myers also admitted that he continued to sell these products despite knowing about the prohibition in Philadelphia, Pennsylvania.

> Q. Okay. On December 10th, 2020, The Philadelphia City Council approved and passed bill number 200593, amending Chapter 10/2000 of the Philadelphia Code which states that "no person shall sell or otherwise transfer a firearm finishing device or an unfinished frame or receiver unless the transferor and the transferee are both federal firearms licensees" were you aware of that when Tactical Gear Heads sold the products that it sold to Kimbrady Carriker?
> A. I'm sorry. could you repeat what the date was? And did you say it was just Philadelphia?
> Q. It was approved by City Council on December 10th 2020. It was signed into law by the Mayor on January 27th, 2021?
> A. I believe so.
> Q. You believe you were aware of that?
> A. At the time of Mr. Carriker's purchase, I believe so.

See Exhibit "Y" (Myers Deposition Transcript pg. 129 ln. 20 – Pg. 130 ln. 17).

Sometime in 2022 Chad Myers came to possess all 100 percent of the shares of Tactical Gear Heads, up from the 70 percent that he had owned before that time. See Exhibit "Z" (Myers Deposition Transcript pg. 17 ln. 9-12). In his Answers to Plaintiff's First Set of Interrogatories Chad Myers asserted that with regard to Tactical Gear Heads he was "member and president –

2012 – present. Myers has been the only member of TGH since 2022". Exhibit "P" (Defendant's Answers to Plaintiff's First Set of Interrogatories at Pg. 5 Interrogatory No. 10). [2]

Mr. Myers' substantial contacts with Pennsylvania go even beyond the tens of thousands of ghost gun products that he sold into the Commonwealth and the extensive online marketing that he did to secure those sales. Mr. Myers also made tens of thousands of dollars of purchases of components and jig finishing kits for Sig Sauer handguns from a company based in Pennsylvania. See Exhibit "AA" (Myers Deposition Transcript pg. 145 ln. 4 pg. 151 – ln. 3) *See also*, Exhibit "BB" showing Chad Myers purchasing $2,540.00 of these products from JSD Supply, which is located at 106 Poplar Lane, Pottersville, Pennsylvania.

Additionally, Chad Myers believes that he registered Tactical Gear Heads with the State of Pennsylvania "for sales tax filings".

> A.    I believe Tactical Gear Heads would have registered with the state of Pennsylvania for sales tax filings.
> Q.    Okay. So, you think that you did register with Pennsylvania?
> A.    I believe so.

See Exhibit "CC" (Myers Deposition Transcript pg. 96 ln. 21-pg. 97 ln. 2)

Chad Myers also believes that he obtained a "retail merchant certificate with the state of Pennsylvania". See Exhibit "DD" (Myers Deposition Transcript pg. 99 ln. 3-5).

Defendant Chad Myers had complete and total control over the substantial sales and Marketing of ghost gun products into Pennsylvania, including the ones that were used for the mass shooting in Kingsessing that killed Plaintiff's Decedent. When he learned of Attorney General Shapiro's stance on his products, he immediately stopped selling them into Pennsylvania

---

[2] It should be noted that in his deposition, Mr. Myers sought to amend his sworn answer to Plaintiff's Interrogatories by conveying that at some time in 2022 a new company that is owned by he and his wife called Uncommon Gear came to own all of the shares of Tactical Gear Heads.

and changed his website to state that sales would no longer be made into the Commonwealth. At that time, and in the exact same message, Mr. Myers noted how much of his sales he would be giving up as a result of this stoppage. See Exhibit "J". Within a year, Mr. Myers decided that he was no longer willing to forgo the money that he was making selling his products into Pennsylvania and started doing so again, removing the stated prohibition from his website and once again marketing ghost gun products to people who wanted to secretly and illegally obtain military style assault rifles in Pennsylvania. Chad Myers actions caused the Kingsessing mass shooting and the death of Plaintiff's Decedent and his challenge to Personal Jurisdiction should be denied.

## IV.    CONCLUSION

For the reasons stated above, Plaintiff respectfully requests that this Honorable Court enter an Order denying Defendant Chad Myers' Motion to Dismiss.

KLINE & SPECTER, P.C.

By: _____

JOHN P. O'NEILL, ESQUIRE
Attorney ID: 205677
1525 Locust Street
Philadelphia, PA 19102
215-772-1000
Date: August 10, 2026                Attorney for Plaintiffs

14